No. 22 April 24, 2014 241

IN THE SUPREME COURT OF THE
STATE OF OREGON

In the Matter of M. M., L. M., O. M., L. M.,
J. M., P. M., N. M., and J. M.,
Children.

DEPARTMENT OF HUMAN SERVICES,
*Respondent on Review,*

*v.*

S. M.
and R. M.,
*Petitioners on Review.*

(CC J110590, J110591, J110592, J110593,
J110594, J110595, J110596, J110597;
CA A151376 (Control), A151377, A151378, A151379,
A151380, A151381, A151386, A151388;
SC S061386 (Control), S061387)

On review from the Court of Appeals.*

Argued and submitted November 5, 2013, at Franklin High School, Portland, Oregon.

Kimberlee Petrie Volm, Deputy Public Defender, Salem, argued the cause and filed the brief for petitioners on review. With her on the brief were Peter Gartlan, Chief Defender, and Sarah Peterson, Deputy Public Defender.

Michael A. Casper, Deputy Solicitor General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna Joyce, Solicitor General.

Before Balmer, Chief Justice, and Kistler, Walters, Linder, Landau, and Baldwin, Justices.**

_____

\* On appeal from Marion County Circuit Court, Julia A. Philbrook, Judge. 256 Or App 15, 300 P3d 1254 (2013).

\*\* Brewer, J., did not participate in the consideration or decision of this case.

KISTLER, J.

The decision of the Court of Appeals and the judgments of the circuit court are affirmed.

**KISTLER, J.**

The juvenile court took jurisdiction over parents' children and appointed the Department of Human Services (DHS) as the children's legal custodian and guardian while the children were wards of the court. The question that this case presents is whether the legislature gave DHS, in its capacity as either the children's custodian or their guardian, authority to have the children immunized against common childhood diseases. Both the trial court and the Court of Appeals held that the legislature gave DHS that authority. *See Dept. of Human Services v. S. M.*, 256 Or App 15, 300 P3d 1254 (2013). We allowed parents' petition for review and now affirm the Court of Appeals decision and the trial court's judgments.

Mother and father are the parents of eight children, who ranged in age from one to 10 years old when this case began. After a neighbor notified DHS about the conditions in parents' home, a DHS caseworker checked on those conditions, spoke with parents, and also spoke with the children. Among other problems, the caseworker found the house bestrewn with garbage and food, the children dirty, and the children's educational needs barely addressed by mother's home-schooling curriculum. DHS filed a petition with the juvenile court, alleging that the children were within the court's jurisdiction because the "condition or circumstances [of the children were] such as to endanger [the children's] welfare or others[' welfare]." ORS 419B.100(1)(c). In particular, DHS alleged that father had acted violently towards mother, that mother and father had failed to provide the children with adequate shelter and necessities, and that mother and father had failed to attend to the children's educational needs. DHS also alleged that mother and father had failed to attend to the children's ordinary hygiene and healthcare needs. The court issued a shelter order placing the children in the temporary care of DHS and recommending that the children remain in parents' custody.

Over the next several weeks, DHS worked with mother to improve the family's living conditions. By then, father had moved to Utah for work. Despite some improvement in the family's living conditions, the court ordered that

the children be placed in foster care, and, in January 2012, parents and DHS reached an agreement. As part of that agreement, parents admitted all the allegations in DHS's jurisdictional petition, except the allegations of medical neglect. They also stipulated that the admitted facts supported a finding that the juvenile court had jurisdiction over the children. Accordingly, the juvenile court took jurisdiction over the children and issued a dispositional judgment for each child. It also appointed DHS as each child's legal custodian and legal guardian.

Four months later, DHS requested a review hearing. During a discussion of the children's status, the children's attorney and DHS notified the court that the children needed to be immunized against common childhood diseases both for their own safety and also for the safety of other children at their school. Parents objected, in part, because the juvenile court had never determined that they were unfit to make medical decisions for the children.[1] Mother also raised religious objections. Asked to explain those objections in more detail, she told the court, "[P]art of [her] beliefs in regards to [immunization] is (inaudible) and there is a stem cell line that the actual product isn't (inaudible) but it is based on [an] inadvertent [*sic*] fetus from 1970 and stem cells were reproduced over and over and over again. (Inaudible)."

The juvenile court commended mother's interest in medical research about immunizations: "You've done your research and I appreciate that." It also noted that mother had made medical decisions about her children in the past, including a decision to immunize some of the older children. But the court ultimately concluded that, because "the children are in the care and custody of the [s]tate at this point," it would allow "the children [to] be immunized as per the decision of the medical provider when the foster parents take them in for evaluation ***."

After that hearing, the juvenile court entered a "review judgment" for each child, which provided that "[each] child may be immunized over the parents' objection based

---

[1] Mother and her lawyer were present at the hearing. Father appeared through his lawyer.

on medical advice." Parents moved to stay any immunization pending appeal, and the juvenile court stayed that part of its judgments. Parents then filed a consolidated appeal of the eight review judgments, assigning error to the juvenile court's determination that DHS could approve the immunization of the children based on medical advice. On appeal, parents argued that DHS lacked statutory authority to make medical decisions because medical neglect was not one of the factual allegations on which the juvenile court had based jurisdiction. Alternatively, they relied on *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000), for the proposition that, even if DHS had the requisite statutory authority, DHS could not exercise that authority unless it established that parents were unfit to make decisions about immunizations and that immunizations were necessary for the children's short-term health. The Court of Appeals disagreed with both arguments. *See Dept. of Human Services v. S. M.*, 256 Or App at 31. We allowed parents' petition for review.

On review, parents renew their argument that DHS lacked statutory authority to immunize the children. They recognize that ORS 419B.376, read in isolation, might appear to give DHS that authority. They argue, however, that, when ORS 419B.376 is read in light of later-enacted statutes creating long-term guardianships, it becomes apparent that DHS's authority as the children's legal guardian is limited to making decisions regarding the issues that brought the children within the juvenile court's jurisdiction in the first place. Before turning to parents' argument, it is helpful to describe briefly the statutes that govern wardship, legal custody, and legal guardianship.[2]

When a child's "condition or circumstances are such as to endanger [the child's] welfare," a juvenile court may exercise jurisdiction over the child and his or her family. ORS 419B.100. The juvenile court takes jurisdiction to protect the child's safety and to work with the child's family to

---

[2] The statutes that govern this area are complex. In describing how those statutes work, we discuss only the statutes that are relevant to this case and to parents' arguments. We have not sought to be comprehensive. Our goal is not to write a treatise but to provide a sufficient overview to put parents' statutory arguments in context.

correct the problems that gave rise to the court's exercise of jurisdiction. ORS 419B.090(2). When a juvenile court finds a child to be within its jurisdiction, the child becomes a ward of the court. ORS 419B.328(1).

Once a child is a ward of the court, the juvenile court may direct that the ward remain in the legal custody of the ward's parents, or it may direct that the ward be placed in the legal custody of a relative, a foster home, or DHS. ORS 419B.331; ORS 419B.337. The ward's legal custodian has "physical custody and control of the ward." ORS 419B.373(1). The legal custodian has a duty to supply the ward with food, clothing, shelter, and other incidental necessities. ORS 419B.373(2). The custodian also may "authorize ordinary medical, dental, psychiatric, psychological, hygienic or other remedial care." ORS 419B.373(4). Finally, "in an emergency where the ward's safety appears urgently to require it," the legal custodian may authorize "surgery or other extraordinary care." *Id.*

When a juvenile court appoints DHS as a ward's legal custodian, ORS chapter 419B contemplates that DHS will develop a case plan to ameliorate the problems that brought the ward within the court's jurisdiction, ORS 419B.343; that DHS will "make reasonable efforts to make it possible for the ward to safely return home" unless certain aggravating circumstances exist, ORS 419B.340(5); and that DHS will file periodic reports with the juvenile court concerning the care DHS has provided and the progress that the family has made towards reunification, ORS 419B.443. The juvenile court may hold hearings after receiving those periodic reports and is required to do so when certain parties request a hearing. ORS 419B.449. Finally, the juvenile court may dismiss commitment of a ward to DHS's legal custody if, among other reasons, the court determines that the ward has been safely reunited with the parents. ORS 419B.337(7).

In addition to the authority that a legal custodian has to make decisions for the ward, ORS chapter 419B also provides that either the juvenile court or its designee will serve as the ward's legal guardian and gives that guardian greater decision-making authority. Specifically, ORS 419B.372 provides that, when a child becomes a ward of

the court, "the court as an incident of its wardship has the duties and authority of the guardian as provided in ORS 419B.376[.]" ORS 419B.372(3). ORS 419B.376, in turn, provides that a legal guardian can consent to the ward's marriage, authorize the ward to enlist in the armed forces, "authorize surgery for the ward," and "make other decisions concerning the ward of substantial legal significance." ORS 419B.372 and ORS 419B.376 thus make the juvenile court, as an incident of its wardship, the ward's guardian and give the juvenile court the authority to make more significant decisions for the ward than the legal custodian may.

Although the juvenile court may act as the ward's legal guardian as an incident of its wardship, the court also may transfer its authority as a guardian to the ward's legal custodian. ORS 419B.372(1), (2). Specifically, ORS 419B.372(1) provides that, if the juvenile court grants legal custody of a ward to DHS, it "may also grant guardianship of the ward to the department, to remain in effect solely while the ward remains in the legal custody of [DHS]."

ORS chapter 419B contemplates that, as a general matter, a guardianship that arises as an incident of wardship will not be long-term. Rather, ORS chapter 419B provides that, if a ward has not been reunited with his or her family within 12 months after the ward came into the juvenile court's jurisdiction, the juvenile court will hold a "permanency hearing" to determine an appropriate long-term path for the ward. ORS 419B.476. At the permanency hearing, the juvenile court will determine whether it is appropriate for DHS to: (1) continue working towards reunification with the family; (2) place the child for adoption and petition for termination of parental rights; (3) refer the ward "for establishment of legal guardianship"; or (4) place the ward "in another planned permanent living arrangement." ORS 419B.476(5)(b).

ORS chapter 419B identifies at least two long-term legal guardianships that may be appropriate in lieu of terminating parental rights. First, the juvenile court may establish a permanent guardianship if it finds by clear and convincing evidence that a ground for terminating parental

rights exists, that it is in the ward's best interest that the ward's parents should never have physical custody of the ward, but that other parental rights and duties should not be terminated. ORS 419B.365. Second, the court may establish what is sometimes referred to as a "durable" guardianship if the court finds by a preponderance of the evidence that the ward cannot safely be returned home within a reasonable time, that adoption is not an appropriate plan for the ward, that the proposed guardian is suitable, and that a durable guardianship is in the ward's best interests. ORS 419B.366(2), (5).[3]

With that statutory background in mind, we turn to the issue that divides the parties—whether DHS, as either the children's legal custodian or their guardian, has statutory authority to have the children immunized against common childhood diseases over their parents' objection. On that issue, DHS identifies two sources of statutory authority to approve immunization. DHS notes initially that, as the children's legal custodian, it may "authorize ordinary medical, dental *** or other remedial care and treatment." ORS 419B.373. Reasoning that immunizations are a routine or ordinary medical procedure, DHS contends that its status as the children's legal custodian, standing alone, gives it the necessary authority. Additionally, DHS notes that, as the children's legal guardian, its "duties and authority" include but are not limited to "authoriz[ing] surgery for the ward." ORS 419B.376. DHS reasons that, if it may "authorize surgery for the ward," it necessarily follows that it may authorize a less invasive and more routine medical procedure, such as immunization against common childhood diseases.

We need not decide whether DHS's first argument is correct; that is, we need not decide whether immunizations constitute "ordinary medical care" that DHS may authorize as the children's legal custodian. The juvenile court appointed DHS as the children's legal guardian as

---

[3] A durable guardianship differs from a permanent guardianship in that the criteria for establishing a durable guardianship are less stringent than those for a permanent guardianship. *Compare* ORS 419B.366(5) (durable guardianship), *with* ORS 419B.365(2), (3) (permanent guardianship). Moreover, a parent may move to vacate a durable guardianship but not a permanent guardianship. *See* ORS 419B.368(1), (7).

well as their legal custodian. As DHS notes, its authority as the children's legal guardian includes but is not limited to authorizing "surgery for the ward" and making "other decisions concerning the ward of substantial legal significance." ORS 419B.376.[4] We agree with DHS that the power to "make other decisions *** of substantial legal significance" includes the power to immunize the wards in its care against common childhood diseases. Indeed, immunization is less invasive and more routine than surgery, which DHS specifically may authorize as the wards' legal guardian. *Cf. Baker v. City of Lakeside*, 343 Or 70, 76, 164 P3d 259 (2007) (explaining that "[w]e ordinarily assume that a non-specific term in a series *** shares the same qualities as the specific terms that precede it").

Under ORS 419B.372 and ORS 419B.376, DHS had statutory authority as the children's legal guardian to approve their immunization. Consistently with its own rules, however, DHS did not make that decision unilaterally. Rather, it notified the juvenile court and sought the court's concurrence, thereby giving the children's parents the opportunity to voice any objection they might have to the proposed procedure and also giving the court the opportunity to pass on the issue. *See* OAR 413-020-0170(4) (providing that DHS may "notify the juvenile court, and/or seek the court's concurrence" for actions taken as a ward's legal guardian).[5]

---

[4] As noted, ORS 419B.372(3) provides that, when a child becomes a ward of the court, "the court as an incident of its wardship has the duties and authority of the guardian as provided in ORS 419B.376 and 419B.379." ORS 419B.372(1) provides that, when the court grants legal custody to DHS, it "may also grant guardianship of the ward to the department." DHS thus obtained "the duties and authority of the guardian as provided in ORS 419B.376" that the court held as an incident of its wardship. *Accord* ORS 419B.376 (similarly providing). Those duties and authority "includ[e] but [are] not limit[ed] to the following: *** To authorize surgery for the ward." ORS 419B.376.

[5] DHS's decision was not unilateral in another sense. As the trial court's order recognizes, a doctor still has to conclude that immunization against common childhood diseases is medically appropriate. Medical approval appears to be a foregone conclusion, however. *See*, *e.g.*, Advisory Committee on Immunization Practices, "General Recommendations on Immunization," 60 *Centers for Disease Control Morbidity and Mortality Weekly Report*, No. RR-02, p.3 (Jan 28, 2011), *available at* http://www.cdc.gov/mmwr/preview/mmwrhtml/rr6002a1.htm (last accessed Apr 1, 2014); American Academy of Family Physicians Advisory Committee on Immunization Practices, "2014 Recommended Childhood, Adolescent, and Catch-up Immunization Schedules," *available at* http://www.aafp.org/patient-care/immunizations/schedules.html (last accessed Apr 1, 2014).

Parents acknowledge that, if ORS 419B.372 and ORS 419B.376 were the only statutes that applied, it would be difficult to argue that DHS lacked statutory authority to have the children immunized. They contend, however, that statutory changes that the legislature made after it enacted ORS 419B.372 and ORS 419B.376 reveal that DHS's authority as the children's legal guardian is more limited than might otherwise appear.

Parents' argument faces a difficult but not insurmountable hurdle. Ordinarily, a later legislature's understanding of a previously enacted statute has no bearing on what that statute means. *See DeFazio v. WPPSS*, 296 Or 550, 561, 679 P2d 1316 (1984) (explaining that "[t]he views legislators have of existing law may shed light on a new enactment, but it is of no weight in interpreting a law enacted by their predecessors"). However, this court has recognized a limited exception to that general rule. Later amendments that materially change the text or context of an earlier statute can change the meaning of the earlier statute when the changed meaning is either "expressly declared or necessarily implied." *State v. Ofodrinwa*, 353 Or 507, 529-30, 300 P3d 154 (2013) (holding that, even if the phrase "does not consent" initially referred only to a lack of actual consent, the later addition of a defense that assumed that the phrase included the lack of capacity to consent necessarily altered the phrase's meaning); *State v. Swanson*, 351 Or 286, 292, 266 P3d 45 (2011) (holding that the later-enacted definition of crime in the 1971 substantive criminal code necessarily narrowed the meaning of that term in the earlier-enacted procedural code).

As we understand parents' argument, they contend that, in authorizing durable and permanent guardianships, the legislature either expressly declared or necessarily implied that guardianships that arise as an incident of wardship carry with them less authority than ORS 419B.372 and ORS 419B.376 provide. Parents' argument runs as follows: In 1993, the legislature provided for guardianships arising as an incident of wardship and specified the authority that that guardianship conferred. *See* Or Laws 1993, ch 33, §§ 114, 116 (enacting what is now codified as ORS 419B.372

and ORS 419B.376).[6] In 1995 and 2003, the legislature authorized juvenile courts to establish permanent and durable guardianships. *See* Or Laws 1995, ch 767, § 2 (permanent guardianships); Or Laws 2003, ch 229, § 2 (durable guardianships). Parents also note that a greater quantum of proof is required before a juvenile court may establish either a permanent or a durable guardianship. *See* ORS 419B.365 (permanent guardianships); ORS 419B.366 (5) (durable guardianships).

Because each of the three guardianships (a guardianship that arises as an incident of wardship, a durable guardianship, and a permanent guardianship) requires a different amount of proof, parents infer that each guardianship carries with it a different level of decision-making authority. The greater the proof, the greater the level of authority, or so parents' argument runs. It follows, in parents' view, that the legislature intended to limit the authority of a guardianship that arises as an incident of wardship to something less than the authority set out in ORS 419B.376. It also follows, in parents' view, that a guardianship that arises as an incident of wardship confers authority over only those issues that caused the children to come within the juvenile court's jurisdiction in the first place.

Parents' statutory argument is difficult to square with the text of ORS 419B.372 and ORS 419B.376. As noted, ORS 419B.372 states that a guardianship that arises as an incident of wardship carries with it "the duties and authority of the guardian as provided in ORS 419B.376[.]" Parents, however, argue that as a result of later changes to ORS chapter 419B a guardianship incident to wardship confers less authority than ORS 419B.376 says. We can, however, read the chapter differently, in a way that gives effect to all the applicable statutory provisions. For example, even if

---

[6] ORS 419B.376 essentially tracks *former* ORS 419.521 (1991), which was enacted in 1959. *See* Or Laws 1959, ch 432, § 24. The 1959 statute did not include a proposed amendment that would have limited the juvenile court's statutory authority to approve a medical procedure over a parent's religious objection. *See* House Judiciary Committee, HB 153, Ex 1(o) (Letter from the Committee Chair to Geoffrey Hazard, Apr 8, 1959, explaining the committee's resolution of the issues before it); *id.*, Ex 1(d) (Letter from the Christian Science Committee on Publication to the Committee Chair, Mar 5, 1959, requesting such an amendment).

the 1995 and 2003 amendments could be read to suggest that each of the three types of guardianships confers graduated levels of decision-making authority, as parents argue, parents never explain why ORS 419B.376 does not identify the level of authority that a guardianship incident to wardship confers, with the other two guardianships conferring greater authority.

Alternatively, the fact that greater proof is required to establish durable and permanent guardianships does not necessarily imply that those guardianships confer greater decision-making authority. Rather, the greater proof requirement can be understood as a function of the fact that durable and permanent guardianships are long-term alternatives to termination, as opposed to a guardianship that arises as an incident of a wardship and that usually lasts only until the long-term alternative determined at the permanency hearing is implemented. If the 1995 and 2003 amendments are understood that way, then ORS 419B.376 identifies the level of decision-making authority that all guardianships confer. That interpretation gives effect to all the statutory provisions and does not do violence to the plain language of ORS 419B.372 and ORS 419B.376, as parents' interpretation does. *See* ORS 174.010 (when a statute contains multiple provisions, we should read those provisions, if possible, in a way that gives effect to all of them). At a minimum, that interpretation makes clear that the change in the meaning of ORS 419B.372 and ORS 419B.376 that parents see as flowing from the 1995 and 2003 amendments is neither expressly declared nor necessarily implied.

Were there any doubt about the matter, we note that parents' argument is difficult to reconcile with the legislative history of the 2003 amendments. The 2003 amendments authorized juvenile courts to establish durable guardianships and also provided for judicial oversight of a guardian's exercise of his or her responsibilities. Or Laws 2003, ch 229, §§ 2-4. Those amendments were the result of a bill that the Oregon Law Commission proposed in 2002. Minutes, Senate Committee on the Judiciary, SB 70, Feb 5, 2003 (statement of Lisa Kay); *Id.*, Ex D (Oregon Law Commission Report). Lisa Kay chaired the Law Commission subcommittee that drafted the proposed bill. *See id.*, Ex D

(Oregon Law Commission Report). She also appeared before the Senate Committee on the Judiciary to explain how the bill, if enacted, would work. In distinguishing the different types of guardianships (permanent, durable, and incident to wardship), Kay clarified existing law. She explained that, when the juvenile court takes jurisdiction of a ward, a guardianship incident to wardship arises and that the juvenile court can designate the ward's legal custodian as the ward's guardian. Testimony, Senate Committee on the Judiciary, SB 70, Feb 5, 2003, Tape 18, Side A. She also explained, in response to a question from the committee chair, that "[t]here are some of the legal duties and authorities of a guardian that you want somebody with legal custody to be able to do such as authorize surgery and whatnot for the child." *Id.*

Kay thus made clear that a guardianship that arises as an incident of wardship permits the guardian to "authorize surgery *** for the child." That is, Kay made clear that a guardianship that arises as an incident of wardship carries with it the authority that ORS 419B.376 provides, precisely as ORS 419B.372 states. Kay's explanation of the effect of creating a durable guardianship negates the premise on which parents' argument rests—that, in creating durable guardianships, the 2003 legislature intended to limit the authority that ORS 419B.372 and ORS 419B.376 expressly confer on guardianships that arise as an incident of wardship. Having considered the text, context, and legislative history of the 1995 and 2003 amendments to ORS chapter 419B, we conclude that those amendments neither expressly declare nor necessarily imply a legislative intent to alter the plain text of ORS 419B.372 and ORS 419B.376. Parents' statutory argument fails.

Two other issues remain. First, parents argue that we should interpret ORS 419B.372 and ORS 419B.376 consistently with due process. *See* ORS 419B.090(4) ("[T]the provisions of this chapter shall be construed and applied in compliance with federal constitutional limitations."). The principle of statutory interpretation that parents invoke is a familiar one. *See Dept. of Human Services v. J. R. F.*, 351 Or 570, 578-79, 273 P3d 87 (2012) (applying that principle). Parents, however, have not argued on review that giving

effect to the plain language of ORS 419B.372 and ORS 419B.376 violates due process or any other constitutional provision.[7] Nor have they adequately identified a due process problem that we should interpret ORS 419B.372 and ORS 419B.376 to avoid. Finally, parents have not explained how the principle of statutory construction they invoke applies if, as we conclude, ORS 419B.372 and ORS 419B.376 are not ambiguous. *See State v. Kitzman*, 323 Or 589, 602, 920 P2d 134 (1996) (concluding that where "one plausible construction of a statute is constitutional and another plausible construction of a statute is unconstitutional, courts will assume that the legislature intended the constitutional meaning"). Without an ambiguity and without an identified constitutional problem, the principle of construction on which parents rely does not advance their statutory argument.

The second issue is related to the first. Although parents have not raised, on review, an independent constitutional challenge to DHS's decision to have the children immunized against common childhood diseases, we recognize that a legal custodian or guardian could make other decisions on a child's behalf that potentially could implicate the child's or the parent's constitutional rights. DHS has been sensitive to those concerns and, as a result, has promulgated administrative rules to guide the exercise of its authority as the child's legal guardian. For example, OAR 413-020-0170(3)(a) and (4) direct DHS, as the legal guardian, to "[c]onsider the impact of the proposed action upon the welfare of the child, the child's family and the community prior to deciding whether to consent to or authorize the proposed action." If a child is not in DHS's "permanent custody," OAR 413-020-0170(3)(c) requires DHS to "make reasonable efforts to consult the child's legal parent(s) or guardian(s) about the action proposed and consider the parent(s) or guardian's preference" about a proposed action. Finally,

---

[7] Parents cite *Santosky v. Kramer*, 455 US 745, 753, 102 S Ct 1388, 71 L Ed 2d 599 (1982), for the proposition that the "fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they *** have lost temporary custody of their child to the State." The fact, however, that parents retain a protected liberty interest does not mean that DHS has violated it, and parents have not advanced a cogent argument that DHS's decision in this case impermissibly interfered with the liberty interest they retained.

OAR 413-020-0170(4) provides that DHS may "notify the juvenile court, and/or seek the court's concurrence" concerning a proposed action described in ORS 419B.376.

We recognize that those rules provide procedural rather than substantive limits on DHS's exercise of its authority as a ward's legal guardian. However, those procedural rules provide assurance that DHS's decisions as a ward's legal guardian will take into account the parents' concerns and that DHS, having presented the issue to the juvenile court, will abide by its ruling. DHS's rules also provide an avenue for a parent to raise a statutory or constitutional challenge to DHS's proposed action if the parent believes that DHS has exceeded either its statutory authority or constitutional bounds. In this case, parents have argued that DHS lacks statutory authority to immunize the children against common childhood diseases. On that issue, we agree with the trial court and the Court of Appeals that DHS has that authority.

The decision of Court of Appeals and the judgments of the circuit court are affirmed.